[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 07, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-16150

_____

D.C. Docket No. 00-02335-CV-T-30B

ROBERT E. RILEY, JR., as trustee of, and participant in,
the Performance Toyota, Inc. 401(k) Profit Sharing Plan, on
behalf of himself and on behalf of all similarly situated participants
in the plans and shareholders of the Merrill Lynch Growth Fund,
SHELIA CANTRELL, as trustee of, and participant in,
the Performance Toyota, Inc. 401(k) Profit Sharing Plan, on
behalf of herself and on behalf of all similarly situated participants
in the plans and shareholders of the Merrill Lynch Growth Fund,
GREGORY D. DINGLE,  as trustee of, and participant in,
the Performance Toyota, Inc. 401(k) Profit Sharing Plan,
on behalf of himself and on behalf of all similarly situated participants
in the plans and shareholders of the Merrill Lynch Growth Fund,

Plaintiffs-Appellants,

versus

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC,
MERRILL LYNCH GROWTH FUND,
MERRILL LYNCH ASSETT MANAGEMENT, L.P,
ARTHUR ZEIKLE, JAMES H. BODURTHA,
HERBERT I. LONDON, ROBERT R. MARTIN,
JOSEPH L. MAY and ANDRE F. PEROLD,
as the Trustees of the Merrill Lynch Growth Fund,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

**(June 7, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH[*], District
Judge.

BARKETT, Circuit Judge:

Robert E. Riley and Sheila Cantrell are the trustees of the Performance
Toyota, Inc. Profit Sharing Plan ("Performance Plan"), and Gregory Dingle is the
trustee of the Master Packaging, Inc. 401(K) plan ("Master Packaging"). Both
plaintiffs initially filed a class action[1] in federal district court against Merrill Lynch[2]
alleging a violation of two Florida statutes: the Florida Securities and Investor
Protection Act (Fla. Stat. Ann. §517.011 et seq.) and the Florida Deceptive and

---

[*]Honorable Shelby Highsmith, U.S. District Judge for the Southern District of Florida,
sitting by designation.

[1]The putative class consisted of "all persons and entities who purchased or sold shares of
the [Growth] Fund in Florida through Defendant Merrill Lynch Pierce Fenner & Smith, Inc. or
any related entity between November 1, 1997 and April 30, 1999." Plaintiffs estimate that both
the Master Packaging and Performance Plan classes include thousands of putative class
members.

[2]Specifically, the four defendants were Merrill, Lynch, Pierce, Fenner & Smith, Inc., the
Merrill Lynch Growth Fund ("Growth Fund"), the individual trustees of the Growth Fund and
Merrill Lynch Asset Management. For convenience, we refer collectively to the four defendants
as "Merrill Lynch."

Unfair Trade Practices Act (Fla. Stat. Ann. §501.201 et seq.).[3] The complaint

alleged that Merrill Lynch made "material Misrepresentations and Omissions [that]

induced the Plaintiffs and other Class members to purchase and retain shares of the

Growth Fund ...."[4] Merrill Lynch moved to dismiss, arguing (a) that the Securities

Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb ("SLUSA")

specifically barred the plaintiffs' class action and (b) there was no diversity

jurisdiction because one of the Merrill Lynch defendants, the Growth Fund, was

required to be treated as a Florida citizen for diversity purposes because it had

shareholders who, like the plaintiffs, were Florida citizens. While Merrill Lynch's

motion to dismiss was pending, the district court sua sponte issued an order to show

cause why the complaint should not be dismissed for lack of jurisdiction.

Performance Plan responded by filing a Notice of Voluntary Dismissal Without

Prejudice and then re-filing its action in state court.[5]

Pursuant to the removal provision of SLUSA, Merrill Lynch immediately

removed the Performance Plan action "back" to federal court, where it was "re-

---

[3]The Plaintiffs did not bring any claims directly under federal law.

[4]The purported basis for jurisdiction was diversity. As noted, all claims were brought under Florida state law.

[5]Thus, parallel actions were proceeding in state and federal court, with the Performance Plan plaintiffs in state court and the Master Packaging plaintiffs remaining in federal court.

consolidated" with the Master Packaging action. Performance Plan moved to remand the action to state court, but the district court denied the motion. Shortly thereafter, the Court issued an order dismissing the complaints of both Performance Plan and Master Packaging under SLUSA and for lack of diversity jurisdiction over the underlying state law claims.

We review the district court's grant of a motion to dismiss de novo. Lowell v. Am. Cyanamid Co., 177 F.3d 1228, 1229 (11th Cir. 1999). We review the district court's jurisdictional rulings and its interpretation of SLUSA de novo. United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991).

## DISCUSSION

As always, jurisdiction is a threshold inquiry that we are required to consider before addressing the merits of any claim. But the jurisdictional analysis here is complicated by the unique procedural posture of this case. Master Packaging filed suit in diversity directly in federal court, and never left. Thus, the district court was, and this court now is, required to assess whether Master Packaging was diverse from each and every defendant before addressing the merits of its Florida statutory claims and before determining whether SLUSA barred those claims. See University of S. Ala. v. American Tobacco Co., 168 F.3d 405, 412 (11th Cir. 1999).

Performance Plan, in contrast, voluntarily left federal court in response to the

4

district court's jurisdictional inquiry, and re-filed its suit in Florida state court. The only reason Performance Plan found its way back to federal court was that Merrill Lynch removed its state lawsuit pursuant to SLUSA. Because SLUSA was the only basis for removal, the trial court was first required to assess, with respect to Performance Plan, whether SLUSA permitted removal from state to federal court. Because the sequence of analysis differs with respect to each plaintiff, we consider each separately.

**I.** <u>The Master Packaging Action and Growth Fund's Citizenship</u>

There are two issues raised with respect to Master Packaging's appeal. The threshold issue is whether there is diversity jurisdiction. If we conclude that there is jurisdiction, we must turn to the question whether SLUSA bars Master Packaging's lawsuit. For the reasons set forth below, we conclude that the requisite diversity is lacking. Therefore we do not reach the question of whether SLUSA bars Master Packaging's lawsuit.[6]

Master Packaging sued the Merrill Lynch defendants solely under Florida statutory law and the basis for federal jurisdiction was diversity of citizenship. In

---

[6]As detailed below, we do consider SLUSA's applicability with respect to Performance Plan's lawsuit. We recognize that our application of SLUSA to Performance Plan will, in the abstract, also be applicable to Master Packaging. But because there is no diversity jurisdiction, which is the threshold inquiry in the Master Packaging action, we do not address SLUSA in the context of its appeal.

5

order for federal diversity jurisdiction to exist, each defendant must be diverse from each plaintiff. See Univ. of S. Ala., 168 F.3d at 412 (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806)). Merrill Lynch contends that one of the defendants, Growth Fund, is not diverse from the Florida-based Plaintiffs because some of its shareholders are Florida citizens. Regardless of the fact that the Growth Fund was organized as a business trust under Massachusetts law, Merrill Lynch argues, it should be deemed, for diversity purposes, a citizen of each state in which it has at least one shareholder. Accordingly, Merrill Lynch contends, there is no diversity jurisdiction in this case because, as a Florida citizen, the Growth Fund is not diverse from the Florida plaintiffs. The trial court, citing Carden v. Arkoma Assocs., 494 U.S. 185, 191-95 (1990), agreed, and so do we.

In Carden the Supreme Court held that, for diversity purposes, an Arizona limited partnership was a citizen of each state in which at least one of its general or limited partners was a citizen.[7] See id. at 195. In reaching this conclusion, the Court very clearly reaffirmed the doctrinal distinction between corporations on the one hand, and all other types of business entities on the other, stating that only corporations would be treated as citizens of their state of incorporation: "While the

_____

[7]The district court and the Fifth Circuit had previously ruled that the partnership's citizenship would be based on the citizenship of the general partners alone.

rule regarding the treatment of corporations as 'citizens' has become firmly established, we have (with an exception to be discussed presently) just as firmly resisted extending that treatment to other entities." Id. at 189. The Court emphasized, "[t]here could be no doubt ... that at least common-law entities (and likely all entities beyond the Puerto Rican sociedad en comandita)[8] would be treated for purposes of the diversity statute pursuant to ... '[t]he tradition of the common law,' which is 'to treat as legal persons only incorporated groups and to assimilate all others to partnerships.'" Id. at 190 (internal citations omitted) (second emphasis added). Thus, the Court stated, "we reject the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members. We adhere to our oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all the members." Id. at 195 (internal quotations and citations omitted).

In its extended discussion of Navarro Sav. Ass'n. v. Lee, 446 U.S. 458 (1980), Carden made clear that the incorporated/unincorporated distinction applies specifically to Massachusetts business trusts, requiring their citizenship to be

---

[8]The Puerto Rican sociedad en comandita is the only artificial entity that the Court has treated as a traditional corporation for diversity purposes.

7

determined on the basis of the citizenship of their shareholders. Navarro was a case involving a Massachusetts business trust that had brought a lawsuit in the names of eight individual trustees, but not in the names of the trust itself or its shareholders. See Navarro, 446 U.S. at 465-66. The defendants claimed that the plaintiff trust was not diverse from all of the defendants on the basis of the rule that Merrill Lynch urges here, namely, that a trust is a citizen of each state in which it has at least one shareholder. In response, the Court affirmed the general rule cited by the defendants, though it rejected its applicability in Navarro because, under the limited facts of the case, the trustees themselves were the real parties in interest. See id. In characterizing Navarro as affirming the incorporated/unincorporated distinction, the Carden Court stated:

> Arkoma claims to have found another exception to our Chapman tradition[9] in Navarro Savings Assn. v. Lee, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980). That case, however, did not involve the question whether a party that is an artificial entity other than a corporation can be considered a "citizen" of a State, but the quite separate question whether parties that were undoubted "citizens" (viz., natural persons) were the real parties to the controversy. The plaintiffs in Navarro were eight individual trustees of a Massachusetts business trust, suing in their own names. The defendant, Navarro Savings Association, disputed the existence of complete diversity, claiming that the trust beneficiaries rather than the trustees were the real parties to

---

[9]Chapman v. Barney, 129 U.S. 677 (1889) initiated the distinction, for diversity purposes, between corporations and unincorporated business entities.

the controversy, and that the citizenship of the former and not the latter should therefore control. In the course of rejecting this claim, we did indeed discuss the characteristics of a Massachusetts business trust--not at all, however, for the purpose of determining whether the trust had attributes making it a "citizen," but only for the purpose of establishing that the respondents were "active trustees whose control over the assets held in their names is real and substantial," thereby bringing them under the rule, "more than 150 years" old, which permits such trustees "to sue in their own right, without regard to the citizenship of the trust beneficiaries." Id., at 465-466, 100 S.Ct., at 1784. Navarro, in short, has nothing to do with the Chapman question, except that it makes available to respondent the argument by analogy that, just as business reality is taken into account for purposes of determining whether a trustee is the real party to the controversy, so also it should be taken into account for purposes of determining whether an artificial entity is a citizen. That argument is, to put it mildly, less than compelling.

Carden, 494 U.S. at 191-92. In this passage, the Court clearly signals that a

Massachusetts business trust–exactly like Growth Fund–is not to be accorded the

status of a corporation for diversity purposes. Instead, like the limited partnership

in Carden, it is to be treated as a citizen of each state in which one of its

shareholders is a citizen.

Significantly, prior to Carden (but based on its underlying precedents) this

Court has applied the incorporated/unincorporated distinction in determining the

citizenship of trusts on the basis of the citizenship of their shareholders. See

Laborers Local 938 Joint Health & Welfare Trust Fund v. B. R. Starnes Co. of Fla.,

827 F.2d 1454, 1457 (11th Cir. 1987). In B.R. Starnes, we stated that, "Trust

9

Funds, which appear to be voluntary unincorporated associations, are not citizens of any particular state; rather, the citizenship of trust fund <u>members</u> is determinative of the existence of diversity of citizenship." <u>Id.</u> (emphasis added). Accordingly, we affirmed the district court's dismissal of the complaint for lack of diversity jurisdiction.

Master Packaging argues that the capacity rule of Fed. R. Civ. P. 17(b), in combination with Mass. Gen. Laws ch. 182 § 6, compels us to conclude that Growth Fund is a Massachusetts Citizen for diversity purposes. We disagree. Fed. R. Civ. P. 17(b) provides that the "capacity of a <u>corporation</u> to sue or be sued shall be determined by the law under which it is organized." (emphasis added). Mass. Gen. Laws ch. 182 § 6, under which the Growth Fund was organized, in turn states that "[a]n association or trust may be sued in an action at law for debts and other obligations or liabilities . . . and its property shall be subject to attachment and execution in like manner as if it were a corporation. . . ."

As an initial matter, R.17(b) says nothing whatever about the status of a business trust, dealing, by its express terms, only with the right of a corporation to sue or be sued. It tells us nothing about the similar (or dissimilar) rights of a business trust. If anything, the mention solely of corporations without any reference to other types of business associations reaffirms the doctrinal distinction

10

of Carden, distinguishing corporations from other types of business entities.

Mass. Gen. Laws ch. 182 § 6 also tells us nothing about the diversity question at issue here. To begin with, Massachusetts state law cannot prescribe rules to govern federal diversity jurisdiction, and the Supreme Court has clearly stated in Carden that unincorporated entities are not to be treated as corporations for diversity purposes. In any event, ch. 182 § 6 says nothing about how business trusts should be treated for purposes of citizenship, stating only that for purposes of property attachment and execution, they are to be treated in the manner of a corporation.

Thus, the district court correctly determined that complete diversity was lacking between Master Packaging and the Merrill Lynch defendants, requiring the dismissal of the Master Packaging class action for lack of jurisdiction. As noted, this determination eliminates the need to reach the SLUSA question with respect to Master packaging. However, in order to review the district court's denial of Performance Plan's motion to remand its action to state court (as well as its subsequent dismissal of that action), we must determine SLUSA's applicability to the Performance Plan action.[10]

---

[10]Because we determine that Growth Fund must be treated as a citizen of Florida (among other states) for purposes of diversity jurisdiction, there is no need for us to address Merrill Lynch's argument that neither Master Packaging nor Performance Plan meets the amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332.

## II.  Does SLUSA Apply to Performance Plan's Claims

SLUSA is the most recent in a line of federal securities statutes originating with Congress' passage of the Securities Act of 1933 ("1933 Act"), 48 Stat. 74 (1933) (codified as amended at 15 U.S.C. § 77a et seq.), and the Securities Exchange Act of 1934 ("1934 Act"), 48 Stat. 881 (1934)(codified as amended at 15 U.S.C. § 78a et seq.), and continuing through Congress' 1995 passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. 104-67, 109 Stat. 737 (1995) (codified in part at 15 U.S.C. §§ 77z-1, 78u).  In construing the meaning of SLUSA's key terms, we must view SLUSA in this larger statutory context.

The 1933 Act deals with the contents of stock registration statements and prospectuses, giving purchasers a private right of action against stock issuers who fail to comply with the statute's requirements.  In relevant part, the 1934 Act, Section 10, makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission ("SEC")] may prescribe ...."  15 U.S.C. § 78j(2)(b) (emphasis supplied).  The SEC accordingly promulgated Rule 10b-5, 17 CFR § 240.10b-5, the basis for a vast amount of modern securities litigation, which

12

provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>> (a) To employ any device, scheme, or artifice to defraud,
>>
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>>
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, <u>in connection with the purchase or sale of any security</u>.

17 CFR § 240.10b-5 (emphasis added).

In 1995, after determining that the federal securities laws, and especially § 10b-5, were being abused through the bringing of "strike suits,"[11] Congress passed the PSLRA. The PSLRA set heightened pleading requirements for class actions alleging fraud in the sale of national securities, <u>see</u> 15 U.S.C. § 78u-4, and also provided for a mandatory stay of discovery to allow district courts, prior to discovery, to determine the legal sufficiency of claims brought in securities class actions, <u>see</u> 15 U.S.C. § 77z-1(b). These reforms were designed to enable securities

---

[11]By "strike suits," Congress referred to securities class actions that had no merit, but that were improperly brought for the purpose of forcing securities defendants into large settlements in order to avoid costly discovery. <u>See</u> H.R. Conf. Rep. No. 105-803 (1998).

defendants to obtain early dismissal of frivolous class actions, and thereby avoid the high expense of discovery. See, e.g., Lander v. Hartford Life and Annuity Ins. Co., 251 F.3d 101, 107 (2d Cir. 2001).

By 1998, however, Congress realized that many of the goals of PSLRA were being frustrated because plaintiffs were simply shifting their securities class actions from federal to state court, where the PSLRA did not restrict their claims. See Pub. L. No. 105-353 § 2(2).[12] By suing in state court under state statutory or common law (rather than under the federal securities laws), litigants were able to circumvent the restrictions placed upon securities claims in federal court. See id. To close this loophole in the PSLRA, Congress passed SLUSA, making federal court the exclusive venue for class actions alleging fraud in the sale of "covered securities." Congress accomplished this by providing for removal of state actions to federal court, and requiring the immediate dismissal of "covered lawsuits." To this end, SLUSA provides, in relevant part:

> (1)    Class action limitations
>
> No covered class action [13] based upon the statutory or

---

[12]According to a joint House-Senate Committee Report, the decline in federal securities class action suits that occurred after the passage of PSLRA was accompanied by a nearly identical increase in state court filings. See H.R. Conf. Rep. No. 105-803 (1998).

[13] SLUSA defines "covered class action" as:

14

common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging--

(A)    a misrepresentation or omission of a material fact <u>in connection with the purchase or sale</u> of a covered security [14]; or

(i) any single lawsuit in which–

(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which–

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

[14]  "Covered security," in turn, is defined as

a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 77r(b) of this title, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred....

15 U.S.C. § 77p(f)(3).  Section 77r(b)(2) states that:

15

(B)     that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

(2)     Removal of covered class actions

Any covered class action brought in any State court involving a covered security, as set forth in paragraph (1), shall be removable to the Federal district court for the district in which the action is pending, and shall be subject to paragraph (1).

15 U.S.C. § 78bb(f) (emphasis added).

Thus, in order to remove an action to federal court under SLUSA, the removing party must show that (1) the suit is a "covered class action," (2) the plaintiffs' claims are based on state law, (3) one or more "covered securities" has been purchased or sold, and (4) the defendant misrepresented or omitted a material fact "in connection with the purchase or sale of such security." See Spielman v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., No. 01 Civ. 3013(DLC) (S.D.N.Y. S.D.N.Y. Oct. 9, 2001) (unpublished opinion); Shaev v. Claflin, Fed. Sec. L. Rep. P 91,452 (N.D. Cal. May 17 2001); Shaw v. Charles Schwab & Co., Inc., 128 F. Supp. 2d 1270, 1272 (C.D. Cal. 2001).

---

[a] security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940.

15 U.S.C. § 77r(b)(2).

SLUSA does not define the term "in connection with the purchase or sale of a covered security." Nor has the Supreme Court yet had occasion to address this phrase in the context of SLUSA, although it has construed and applied the identical phrase as it appears in § 10b-5. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). As Performance Plan points out, however, one court of appeals and several district courts have had an opportunity to construe the meaning of this phrase in SLUSA. See Green v. Ameritrade, Inc., 279 F.3d 590, 597-98 (8th Cir. 2002); Shaev, at 456; Gordon v. Buntrock, No. 00 CV 303 (N.D. Ill. Apr. 28, 2000) (unpublished opinion); Shaw, 128 F. Supp. 2d at 1273-74; Gutierrez v. Deloitte & Touche, L.L.P., 147 F. Supp. 2d 584, 595 (W.D.Tex. 2001); Simon v. Internet Wire, Inc., Fed. Sec. L. Rep. P 91,408 (C.D.Cal. Apr. 3, 2001); Burns v. Prudential Sec., 116 F. Supp. 2d 917, 922-23 (N.D. Ohio 2000). In interpreting this key term in SLUSA, each of these courts has looked, for guidance, to the law interpreting the same phrase, "in connection with the purchase or sale of a covered security," in the context of § 10b-5. They have done so based on the principle that "[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." NLRB

17

v. Amax Coal Co., 453 U.S. 322, 329 (1981).[15]

Analogizing to § 10b-5 is particularly appropriate because SLUSA was specifically enacted as an amendment to the 1933 and 1934 Acts (and their successor statutes). In enacting SLUSA, therefore, Congress was not writing on a blank slate; instead, it was legislating in an area that had engendered tremendous amounts of litigation and received substantial judicial attention. In using the phrase "in connection with the purchase or sale of a covered security," Congress was not creating language from a vacuum; instead, it was using language that, at the time of SLUSA's enactment, had acquired settled, and widely-acknowledged, meaning in the field of securities law, through years of judicial construction in the context of § 10b-5 lawsuits. Under these circumstances, we must presume that Congress intended the phrase "in connection with the purchase or sale of a covered security" to have the same meaning in SLUSA that it has in § 10b-5.

Because, in this case, the parties stipulate that the securities involved are "covered securities," that Performance Plan actually purchased shares of Growth

---

[15]Relying on 10b-5 case law, federal district courts have held, for example, that SLUSA does not apply to state law claims for breach of fiduciary duty that occurred after the sale of the securities in question, see Hines v. ESC Strategic Funds, Inc., No.3:99-0530 (M.D. Tenn. Sept. 17, 1999) (unpublished opinion), and that SLUSA does not bar a state fraud claim where the alleged fraud caused the plaintiffs to choose a particular brokerage house rather than to buy or sell a particular security, see Shaw, 128 F. Supp. 2d at 1273- 74.

Fund, and that Performance Plan's claims are based on state law, the only remaining question is whether the statements allegedly made by Merrill Lynch were made "in connection with the purchase or sale of covered securities," and therefore whether Performance Plan's action was properly removed to federal court, and subsequently dismissed, under SLUSA.

Performance Plan argues that its action was properly brought in state court, under state law because Merrill Lynch's alleged misrepresentations caused it to hold shares of Growth Fund rather than to "purchase or sell" them. Therefore, Performance Plan argues, its complaint falls outside the scope of SLUSA, which covers only claims involving misrepresentations made "in connection with purchase or sale." Performance Plan asserts that Supreme Court precedent interpreting the phrase "in connection with the purchase or sale of a covered security," in the context of § 10b-5, compels this conclusion. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Performance Plan also relies heavily on Gutierrez v. Deloitte & Touche, L.L.P., 147 F. Supp. 2d 584 (W.D. Tex. 2001), which applied Blue Chip's § 10b-5 ruling in the context of SLUSA to hold that SLUSA does not cover claims based purely upon "retention" of securities. Subsequent to the briefing in this case, the Eighth Circuit issued Green v. Ameritrade, Inc., 279 F.3d 590 (8th Cir. 2002), which also relied on Blue Chip to

19

hold that SLUSA did not bar a state law claim for breach of contract.

In Blue Chip, the Supreme Court expressly held that there is no right of action under § 10b-5 unless a challenged misrepresentation or omission caused the plaintiff actually to buy or sell a particular stock. Blue Chip, 421 U.S. at 727. The plaintiffs in Blue Chip brought a class action alleging that Blue Chip had intentionally issued an overly pessimistic prospectus in order to dissuade them from purchasing Blue Chip stock in accordance with their first-purchase right, so that the stock could later be sold to the public at a higher price. Because they had rejected Blue Chip's offer to buy at the initial low price as a result of the misleading prospectus, the plaintiffs sought the right to buy the stock–which had since risen dramatically–from Blue Chip at the original price. The Court framed the central question in the case as follows: "whether respondent may base its action on Rule 10b-5 of the Securities and Exchange Commission without having either bought or sold the securities described in the allegedly misleading prospectus." Id. The Court answered the question in the negative, making clear that § 10b-5's cause of action is limited to "actual purchasers or sellers" of stock. It also noted however, that "[o]bviously, this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law." Id. at 738 n.9 (emphasis supplied). In so stating, the Court recognized that while "holding"

20

claims are not actionable under the federal securities laws, they may well be actionable under state laws that are more stringent than their federal counterparts.

Based substantially on the rule of Blue Chip, the Eighth Circuit held, in Green, that SLUSA did not bar a state law claim for breach of contract where the plaintiffs failed to allege that the defendants made misrepresentations that caused them to buy or sell a covered security. Green sued Ameritrade for breach of contract in state court alleging that he had contracted with Ameritrade to receive "real time" stock quotes on Ameritrade's web site, but the quotes provided were not "real time." Ameritrade removed under SLUSA, claiming that the suit was really one for misrepresentations made "in connection with the purchase or sale of a covered security." The trial court held that Green's claim was not a securities fraud claim within the purview of SLUSA, but simply a claim for breach of contract, and the Eighth Circuit affirmed. See Green, 279 F.3d at 598-99. In reliance on Blue Chip, the Green Court stated:

> [T]he critical question is whether Green's amended complaint can reasonably be read as alleging a sale or purchase of a covered security made in reliance on the allegedly faulty information provided to himself and to putative class members by Ameritrade ... Green's amended complaint completely omits any mention of such reliance. He alleges no sale or purchase of a covered security, only that he did not receive the type of information from Ameritrade for which he believed he

21

had contracted and paid twenty dollars monthly. We are satisfied that nothing in Green's amended complaint suggests that his cause of action arises from a sale or purchase of a security in reliance on information gained from Ameritrade's real-time quote service. The amended complaint simply is not susceptible to being read as alleging anything of the sort. It therefore does not satisfy the criteria for SLUSA preemption.

Id.

Also relying on Blue Chip, the federal district in Gutierrez held that SLUSA does not apply to claims of misrepresentations that caused plaintiffs to retain securities, rather than actually to buy or sell them. In Gutierrez, the plaintiffs brought a class action alleging that the defendant's acts of "accounting misfeasance" caused them to hold securities that they otherwise would have sold. Specifically, the complaint identified a subclass of

> [a]ll persons or entities that held any "covered security" as that term is defined in the Private Securities Litigation Reform Act of 1995 at all relevant times through 1993 through present and did not sell or otherwise dispose of said products prior to June 1999 ....

Gutierrez, 147 F. Supp.2d at 592 (emphasis added).

In arguing that SLUSA did not bar their claim, but that they were entitled to bring their retention claim in state court, under state law, the Gutierrez plaintiffs argued (in the court's words), that:

> category (iii) is explicitly limited to damages caused by the

22

holding of covered securities and the loss of value which resulted from such holding. [It does not seek] purchaser or seller damages arising out of any alleged misrepresentation which may or may not have occurred when the[ plaintiffs] purchased the covered stock. Rather, plaintiffs seek damages for being fraudulently induced to continue to hold stock after they and the category (iii) putative class members had purchased the securities. Plaintiffs maintain they are not asserting a claim "in connection with the sale or purchase" of a covered security and thus their claims are not subject to mandatory removal under the SLUSA.

Id.

Based on Blue Chip, the court held that retention claims were not claims of misrepresentations "in connection with the purchase or sale of a covered security," and that the plaintiffs, therefore, were entitled to bring those claims in state court. The court emphasized that "plaintiffs have 'gone to great lengths' to stress that their first amended petition alleges misrepresentations only in the holding of covered securities." Id. at 593 (emphasis added). The Court further stated:

Although the stocks purchased by subclass category (iii) claimants are covered securities for purposes of the Act, the first amended petition alleges misrepresentations only in the holding of these covered securities and nowhere do plaintiffs allege subclass category (iii) includes purchasers. Rather, as plaintiffs argue, they have "expressly carved out and excluded [purchasers] when they elected to allege only claims for holding covered securities, not the purchase or sale of covered securities."

Id. (emphases in original).

23

We agree with the Gutierrez court, that under Blue Chip, SLUSA does not apply to claims dealing solely with the retention of securities, rather than with purchase or sale. We also agree with the Gutierrez Court's implication, however, that when a claim that sweeps within its ambit actual purchases or sales of stock is covered by SLUSA, a plaintiff may not avoid SLUSA's restrictions simply by alleging that a given misrepresentation caused him both to purchase and hold a particular security.

For this reason, we agree with the district court that Performance Plan's suit is covered by SLUSA, and was not properly brought in state court, under state law. The simple fact is, unlike the carefully-crafted allegations in Gutierrez, Performance Plan's allegations in this case are not limited solely to the retention of covered securities. Paragraph 37, which Performance Plan submits as the principal source of its retention claim, states that Merrill Lynch made "material Misrepresentations and Omissions [that] induced the Plaintiffs and other Class members to purchase and retain shares of the Growth Fund during the Class Period." (emphasis added). This language clearly alleges that Merrill Lynch's conduct caused Performance Plan to purchase covered securities and as retain them. The fact that class members purchased and then retained their Growth Fund shares does not necessarily add anything to the basic claim of purchasing, because

24

all investors, by definition, hold their shares for at least some time after purchase. Thus, while in principle we agree with Performance Plan's argument that SLUSA does not apply to "holding" claims, and that such claims accordingly may be brought in state court, under state law, we do not find that the rule applies in this case.

Alternatively, Performance Plan argues that SLUSA does not apply to state law claims that lack the scienter requirement of the federal securities laws. Performance Plan's syllogistic argument appears to be as follows: Congress did not intend to bar claims pursuant to state laws that are stricter than federal securities laws; Performance Plan's state claims do not require scienter and are thus stricter than federal securities laws; therefore Performance Plan's lawsuit is not preempted by SLUSA.[16] In support of this argument, Performance Plan relies on the district court opinion in Green, supra, (reported at 120 F. Supp. 2d 795 (D. Neb. 2000)), and Burns v. Prudential Sec., 116 F. Supp. 2d 917 (N.D. Ohio 2000). Performance

---

[16] See H.R. Conf. Rep. No.. 105-803, at *2; Compare Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976) (acknowledging scienter requirement of federal securities laws), and Messer v. E.F. Hutton & Co., 833 F.2d 909, 916 (11th Cir. 1987), with W.S. Badcock Corp. v. Myers, 696 So.2d 776, 779 (Fla. Dist. Ct. App. 1996) (no scienter requirement in Florida securities laws), and Davis v. Powertel, Inc., 776 So.2d 971 (Fla. Dist. Ct. App. 2000) (DUTPA liability is objective; question is whether the practice complained of was likely to deceive a consumer acting reasonably in the same circumstances).

Plan claims these cases stand for the proposition that the presence or absence of scienter in a state law securities claim is the determinative factor in deciding whether a pleaded state law claim is a mere substitute for the federal securities laws and, therefore, whether it is barred by SLUSA.

Initially, we find Performance Plan's reliance misplaced. Neither of the cases cited can support this proposition. Burns was a class action brought in state court by clients of Prudential Securities who alleged that over the course of a two-day period, one of Prudential's brokers liquidated their accounts without permission. The plaintiffs brought state law claims for conversion, breach of contract, breach of fiduciary duties, and negligent supervision. Prudential removed to federal court under SLUSA and the plaintiffs moved to remand. The district court granted the motion to remand, holding that SLUSA did not apply because the plaintiffs' claims, while related to securities, were not claims for securities fraud at all. No misrepresentation was alleged in that case. See Burns, 116 F. Supp. 2d at 924. As noted above, exactly the same thing is true of Green. Thus, neither of these cases are applicable to Performance Plan's claim and we have found no case to support the proposition that the absence of scienter in a state securities claim suffices to remove it from SLUSA's scope.

More fundamentally, the premise of Performance Plan's argument is

26

incorrect. SLUSA amends both the 1933 Act (15 U.S.C. § 77p) and the 1934 Act (15 U.S.C. § 78bb), preempting claims brought under both of those statutes. The sections of SLUSA that amend the 1933 Act track the language of §§ 11 and 12(a)(2), and claims under §§ 11 and 12(a)(2) of the 1933 Act do not require a showing of scienter. Thus, SLUSA preempts some claims –namely, those brought under § 11 or 12(a)(2) of the 1933 Act–that lack a scienter requirement. Accordingly, we cannot accept Performance Plan's contention that scienter is the dispositive factor in determining whether a given lawsuit falls within the scope of SLUSA.

In sum, we find no merit to Performance Plan's argument that the district court erred in declining to remand its lawsuit to state court, and in subsequently dismissing the action.

### III. SLUSA is Constitutional

Finally, the plaintiffs argue that SLUSA is unconstitutional because it exceeds Congress' power under the Commerce Clause.[17] We readily disagree.

The Supreme Court has identified three categories of conduct that Congress may regulate under the Commerce Clause: (1) the use of the channels of interstate

---

[17]The plaintiffs also argue that SLUSA violates the Equal Protection clause. This argument lacks merit.

commerce; (2) the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce. United States v. Lopez, 514 U.S. 549, 558-59 (1995). Within each category, Congress' regulatory power is plenary. Id.

SLUSA regulates only national securities markets and expressly deals with claims pertaining to nationally-traded securities. As the district court recognized, "both the securities in question and the defendant in this action are entrenched in interstate commerce." SLUSA defines a "covered security" as "a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." The Growth Fund shares in this case are federally-registered securities and Merrill Lynch's trading operations for Growth Fund shares extend throughout the country. SLUSA thus is constitutional because it regulates both "channels" of interstate commerce (i.e., national securities markets) and "things" in interstate commerce (i.e., nationally-traded securities themselves). Indeed, though it has addressed the 1933 and 1934 securities Acts on countless occasions, the Supreme Court has never invalidated any part of either statute (which SLUSA amended)–or for that matter, any federal statute regulating the national securities markets–on Commerce Clause grounds. See e.g., North Am. Co. v. SEC, 327 U.S. 686, 796 (1946) (rejecting Commerce

28

Clause challenge to Section 11(b)(1) of the 1933 Act because it is long established "that Congress may deal with and affect the ownership of securities in order to protect the freedom of commerce").

## CONCLUSION

Because there is no diversity jurisdiction in this case, the district court properly dismissed Master Packaging's action. We also find that SLUSA is clearly constitutional and applies to Performance Plan's state court lawsuit. Therefore, the district court correctly denied its motion for remand and correctly dismissed that suit. The orders of the district court, therefore, are

**AFFIRMED.**