[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 31, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-10323

_____

D.C. Docket No. 00-00480-CR-CMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JACQUELINE PANSETA BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 31, 2002)**

Before CARNES, HILL and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Jacqueline Panseta Brown appeals her convictions for importation of 500

grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 952(a) and 960(b)(2), and possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(B). Specifically, she challenges the government's use of its peremptory strikes in jury selection, evidentiary rulings by the district court, and the court's denial of a motion to withdraw made by Brown's retained counsel.

## I. Background

Brown, a black Jamaican national, was traveling to Bermuda via Miami when U.S. Customs officers discovered cocaine base in the metal frames of her luggage carts. Cocaine base is the form of cocaine from which cocaine hydrochloride, the powdered form of the drug, is derived, and thus is more potent than cocaine hydrochloride. Although Brown claimed to have no knowledge of the presence of the drugs, the government indicted her on charges of importation of cocaine and possession of cocaine with the intent to distribute. The government later returned two superseding indictments, the latter charging Brown with importation of 500 grams or more of a mixture or substance containing a detectable amount of cocaine, and possession with intent to distribute the same. The

2

government eventually proceeded to trial against Brown under the last superseding indictment.

Before the initial indictment against Brown was returned, the court appointed a federal public defender to represent her. Brown, however, retained her own attorney, David Rowe, prior to the superseding indictments, and filed a stipulation to substitute Rowe for the public defender as her counsel of record. The magistrate judge, to whom pretrial matters had been referred by the district court pursuant to 28 U.S.C. § 636, accepted the stipulation, and substituted Rowe as "permanent counsel in this case." Seven weeks later, Rowe filed a motion to withdraw, indicating that Brown no longer wished him to represent her. The motion was denied by the magistrate judge and never appealed to the district court. Brown therefore proceeded to a jury trial with Rowe as her attorney.

Prior to trial, the government had moved in limine to exclude any evidence or argument by Brown that she had been targeted by U.S. Customs on account of her race; the district court deferred ruling on the matter. At trial, after the government exercised its first two peremptory strikes against African-Americans, the defense raised a Batson objection. The government offered as its reason for challenging one of the stricken jurors that she had worked in the felony division of the county clerk's office and therefore might have developed relationships with

3

other charged felons. The second stricken juror had friends who had used cocaine, as well as a nephew who was in prison on a cocaine-related charge.[1] The district court found the government's proffered reasons to be credible and unrelated to race, and accordingly denied Brown's challenge. When the government exercised its third strike against an African-American juror, Brown renewed her challenge. The government offered that the juror in question had been on a prior jury panel that had been unable to reach a verdict. Brown insisted that this explanation was pretextual, but again, her objection was overruled.

At trial, to prove Brown's knowledge of the presence of the cocaine in her luggage carts, the prosecution relied primarily on the testimony of a DEA agent, offered without objection as an expert in the field of drug valuation, that the wholesale value in Bermuda of the cocaine base with which Brown had been found was approximately $217,000. The government argued that an unknowing innocent would not have been entrusted with such valuable contraband. Brown attempted to contradict this estimated value with a copy of a written DEA price list referred to by the drug valuation expert during his cross-examination, but upon which the expert did not rely in forming his opinion as to the value of cocaine base in

---

[1]On appeal, Brown appears to accept this reason as legitimate, but nonetheless invokes the fact that this stricken juror was African-American to establish the government's pattern of only striking jurors of one race.

Bermuda.  The district court excluded the written price list and disallowed cross-examination on the information contained therein.  The jury convicted Brown on both counts of her indictment, and the court sentenced her to sixty-three months' imprisonment.

## *II.  Discussion*

### *A.     The <u>Batson</u> Challenge*

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 89 (1986), the Supreme Court announced the rule that "the State's privilege to strike individual jurors through peremptory challenges [] is subject to the commands of the Equal Protection Clause."  In cases involving such an equal protection challenge to jury selection, (1) the party challenging the strike must establish a prima facie case of discriminatory intent in the use of peremptory strikes; (2) the party making the strikes must articulate a non-discriminatory explanation for challenging the jurors; and (3) the court must determine whether the party challenging the strike has met her ultimate burden of proving purposeful discrimination.  See <u>Bui v. Haley</u>, 279 F.3d 1327, 1335 (11th Cir. 2002).  A prima facie case is established where the challenging party establishes "facts sufficient to support an inference of racial discrimination."  <u>Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.</u>, 236 F.3d

629, 636 (11th Cir. 2000).  If the explanations of the strikes offered in response are devoid of inherent discriminatory intent, even if not persuasive, the court then proceeds to the ultimate inquiry of whether the objecting party has shown purposeful discrimination.  See Purkett v. Elem, 514 U.S. 765, 768 (1995).

Although this court reviews the constitutional principles of Batson de novo, we accord "great deference" to a district court's ruling on whether the challenging party established a prima facie case.  See United States v. Allen-Brown, 243 F.3d 1293, 1296 (11th Cir. 2001).  We review only for clear error a district court's determinations as to whether the challenged party's proffered explanations are credible.  See id. at 1297.

Assuming arguendo that Brown met her initial burden in making her Batson challenges, the district court did not clearly err in finding that the race-neutral reasons offered by the government for its strikes were credible.  The court made this determination with knowledge of the government's motion in limine, and Brown introduced no evidence tending to discredit the government's proffered explanations and to establish pretext.

B.      *The Evidentiary Rulings*

We generally review a district court's evidentiary rulings for "clear" abuse

of discretion.  <u>United States v. Novaton</u>, 271 F.3d 968, 1005 (11th Cir. 2001), <u>cert. denied</u>, 2002 U.S. LEXIS 4166 (June 3, 2002).  Under this standard of review, even an incorrect evidentiary ruling will not be grounds for reversal unless there is a reasonable likelihood that the error affected the defendant's substantial rights.  <u>See</u> <u>United States v. Hands</u>, 184 F.3d 1322, 1329 (11th Cir. 1999); <u>see also</u> Fed. R. Evid. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected... .").  Where, however, no contemporaneous objection was made to the challenged ruling, the ruling is reviewed only for plain error.  <u>See, e.g.</u>, <u>United States v. Siddiqui</u>, 235 F.3d 1318, 1321 (11th Cir. 2000); <u>United States v. Mendez</u>, 117 F.3d 480, 485 (11th Cir. 1997); <u>see also</u> Fed. R. Evid. 103 (requiring that a timely objection or motion to strike appear in the record before error will be found in evidentiary rulings, but noting that "[n]othing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court").  Where a party challenges the admission of evidence, "[i]n order to find plain error..., we must find that the admission of this testimony constituted a miscarriage of justice."  <u>United States v. Russo</u>, 796 F.2d 1443, 1463 n.8 (11th Cir. 1986).

Brown argues that the district court improperly excluded a DEA drug price list she offered.  She also challenges another ruling by the district court, which she

frames as the erroneous admission of an unwritten government report. We believe

that this latter contention, however, is better understood as a challenge by Brown,

on hearsay grounds, to the basis of the DEA agent's expert opinion on drug value.

The exclusion of the written price list was the subject of a timely objection by

Brown, and we therefore review for abuse of discretion, and the effect of any error

on Brown's substantial rights. There is no indication in the record, however, that

Brown made any objection or motion to strike in reference to the admitted

hearsay,[2] and accordingly, this evidentiary ruling is reviewed under the plain error

standard.

We turn first to the testimony of the DEA agent offered by the government

as an expert in drug valuation. The witness had substantial experience

investigating narcotics smuggling, including involvement in undercover

investigations in which he negotiated narcotics prices with drug dealers. Although

he had never been assigned to Bermuda, the agent was accepted without objection

as an expert in the field of narcotics evaluation. He offered expert opinion that the

approximate wholesale price in Bermuda for the quantity of cocaine base with

---

[2]There is no doubt that the DEA agent offered statements by others regarding the value of cocaine base in Bermuda to prove the truth of the matter asserted, i.e., drug prices, and that the expert's statements did not fall into any of the definitional exceptions to hearsay set forth in Federal Rule of Evidence 801(d). As such, the agent's testimony clearly constituted hearsay. See Fed. R. Evid. 801(c) (defining hearsay).

which Brown was found was $217,000.   In the course of cross-examination, the agent testified that he could not have offered his testimony on value without information provided to him by an intelligence agent in another DEA office, who herself had conferred with Bermuda authorities to arrive at an estimated value.[3]

The district court here did not commit plain error despite the fact that the

---

[3]When asked how, specifically, he obtained information about the street value of cocaine base in Bermuda, the agent responded that he contacted a DEA intelligence agent in Miami, who put him in touch with a DEA intelligence supervisor in Newark, who in turn contacted Bermudan authorities.  The agent testified, "Based on cases that have been conducted and the Bermuda authorities intelligence provided to us, we came up with the value of what currently is the going rate for cocaine base in that country."

At one point during cross-examination, Brown's counsel asked the DEA agent, "Am I correct in saying that the estimate of values of cocaine base, which you gave to the jury, are basically speculation based on information that you received or that you have no direct personal knowledge of the value of cocaine base in Bermuda as you've never been involved in a cocaine base undercover deal?"  The agent stated in response, "I wouldn't say speculation, sir.  You have to understand that the nature of our work and how closely we would [sic] with foreign governments.  We interact with them on a continuous basis to get drug prices from around the world.  It's accurate.  I could say that if a Bermuda authority were to come into this courtroom, they would consistently be saying what I am saying today to the jury."

Later during cross-examination, defense counsel posed a similar question as to the foundation for the agent's drug valuation.  Counsel asked the agent, "you are simply asking the court to accept your word that you heard something from somebody and that's the basis for your testimony about the Bermudan prices?"  To this, the agent responded, "No.  Actually, sir, I'm asking the jury today and this court, based on my experience, my training and my expertise, my undercover operations, and investigations that I've conducted in foreign countries and in the United States, to take what I have learned over the years in this trade and to apply that to what I am testifying to today.  I think that it's relevant that, and consistent with DEA [sic], that if I rely on my foreign police to provide me with intelligence in their country, and I'm not in that physical country, then it's consistent with what we can do and use that as a method of reliability for the court."

During redirect of the DEA agent, the government questioned, "Is the source of information that you have received or testified to in this court with regards to the value of a kilogram of cocaine base in Bermuda, is that the exact sort of intelligence you would rely on than [sic] if you were, you walked in as a drug dealer and posed to make drugs [sic] arrests in the case?," to which the agent replied in the affirmative.

9

agent relied on information and expertise from non-testifying parties.  To the contrary, the testimony of the government's drug valuation expert was properly admitted. Although  "[h]earsay is not admissible except as provided by these rules or by other rules prescribed by the Supreme Court pursuant to statutory authority or by Act of Congress,"  Fed. R. Evid. 802, Federal Rule of Evidence 703 allows experts to rely upon data which itself would not have been admissible, if this data is "of a type reasonably relied upon by experts in the particular field in forming opinions ... ."  We have no trouble concluding that Rule 703 encompasses hearsay statements in a context such as the instant one, where the government expert specifically testified that his opinion was based on his experience and expertise, in conjunction with the information he received from a DEA intelligence agent and Bermudan authorities, and that such sources of information were regularly relied upon in valuating narcotics.[4]  See also 2A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 455 (3d ed. 2000) (stating that "expert testimony, based in part upon reports of others that are not in evidence but of a sort the expert

---

[4]The Advisory Committee Notes to Rule 703 recognize, as an example, that a physician often bases his expert opinions on the opinions of other medical personnel, including nurses, technicians, and other doctors.  Although each of those offering these opinions could be called to the stand themselves and provide their opinions, this could be done "only with the expenditure of substantial time."  Fed. R. Evid. 703 advisory committee's notes, 1972 Proposed Rules.  Instead, Rule 703 allows the testifying physician's "validation, expertly performed and subject to cross-examination," to be considered sufficient for judicial purposes.  Id.

customarily relies upon in the practice of his profession, are [sic] admissible"); cf. United States v. Floyd, 281 F.3d 1346 (11th Cir. 2002) (holding that expert testimony by an ATF agent based partly on his own analysis, but verified by consultation with an ATF technical specialist, was properly admitted under Rule 703 where the agent testified that the consultation was of the kind regularly relied upon by experts in his field).

Further, even before the enactment of Federal Rule of Evidence 703, "[e]xpert witness testimony [was] a widely-recognized exception to the rule against hearsay testimony. It has long been the rule of evidence in the federal courts that an expert witness can express an opinion as to value even though his opinion is based in part or solely upon hearsay sources." United States v. Williams, 447 F.2d 1285, 1290 (5th Cir. 1971).[5] Such an exception to the general rule is based upon the reasoning "that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion." Id. Given that the witness here has been a special agent with the DEA since 1989, the district court would have been justified in concluding that he possessed such professional knowledge and ability.

---

[5]Decisions by the former Fifth Circuit issued before October 1, 1981 are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

11

Although concluding that admission of the DEA agent's testimony did not constitute plain error under the general rules of evidence governing admission of expert testimony, we recognize that criminal cases present special concerns regarding the use of hearsay statements. The Confrontation Clause of the Sixth Amendment to the Federal Constitution forbids the introduction of hearsay evidence against criminal defendants unless the offered hearsay falls into a "firmly rooted hearsay exception" or the hearsay statement at issue carries a "particularized guarantee[] of trustworthiness."[6] Ohio v. Roberts, 448 U.S. 56, 66 (1980). Given Federal Rule of Evidence 703 and long-established circuit precedent, we hold that hearsay evidence relied upon by an expert in forming his opinion, as long as it is of a type regularly relied upon by experts in that field, is a "firmly rooted" exception to the general rule of exclusion of hearsay statements, and therefore is not violative of a criminal defendant's confrontation rights. To the extent that Brown's counsel desired to make an issue to the jury of the DEA agent's sources and to question the reliability of his resulting opinion on value, he did so effectively through his cross-examination of the expert. See supra note 3 (quoting extensively from cross-examination of the drug valuation expert).

---

[6]"In all criminal prosecutions, the accused shall enjoy the right... to be confronted with the witnesses against him." U.S. Const., amend. VI.

When asked on cross-examination whether any DEA price list existed as to the street value of cocaine base in the United States, the government expert produced a written list. In fact, however, this DEA list made no specific reference to cocaine base. Instead, it included prices for cocaine hydrochloride, crack cocaine, marijuana, and heroin in U.S. cities and the Bahamas. Brown moved to admit the list into evidence and to conduct cross-examination on the listed prices. By countering the agent's opinion as to the value of the cocaine base in her luggage carts, Brown could attempt to cast doubt on the government's theory of her knowledge, i.e., that an unknowing innocent would not be entrusted with over $200,000 worth of drugs. The district court ruled to exclude the price list.

We conclude that the district court committed no abuse of discretion in excluding the list, which was not relied upon by the testifying DEA agent in forming his opinion as to value. The price list made no reference to drug prices in Bermuda, Brown's intended destination, nor did it contain any prices in Jamaica, Brown's point of origin. Perhaps more important, the list did not reference prices for cocaine base in any market.[7] Even if a great disparity between the price of

---

[7]Although Brown contends that the price of cocaine base is irrelevant, as her indictment charged importation and possession with intent to distribute cocaine, in fact her indictment charged her with crimes concerning "a mixture and substance containing a detectable amount of cocaine." The indictment did not specify cocaine base, but neither did it specify cocaine hydrochloride, to the exclusion of cocaine base. The government offered at trial the results of tests performed by a forensic chemist showing that the drugs found in Brown's luggage carts

13

cocaine hydrochloride in a domestic city and the price of cocaine base in Bermuda were relevant to Brown's defense that she lacked knowledge of the presence of the drugs, admission of such evidence might well have misled the jury and thus would be excludable under Federal Rule of Evidence 403. See Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of... misleading the jury... ."). Moreover, we find it impossible to conclude that Brown's substantial rights were affected by exclusion of this evidence where the valuation expert himself testified to the jury that the value of a kilogram of cocaine in Miami would be near $17,000, significantly less than the $245,000 at which the agent estimated the value of one kilogram of cocaine in Bermuda.[8] Brown's counsel had every opportunity to cross-examine on this point. The agent also testified that drug prices vary by country on account of differences in transportation costs, consumption rates, availability, and economies. Brown's counsel also could have chosen to question

contained cocaine base as the active drug ingredient. Therefore, contrary to Brown's assertion, the value of cocaine base is the relevant value.

[8]Although the agent's testimony does not make clear whether the $17,000 for one kilogram of cocaine in Miami refers to a kilogram of cocaine base or a kilogram of cocaine hydrochloride, it seems from the context of his remarks discussing the difference between the two substances, as well as his later reference to cocaine base as cocaine, that the price is actually in reference to cocaine base. Either way, we find it significant that defense counsel heard this testimony and, although he wished to bring to the attention of the jury the disparity between the price of drugs in Bermuda and the price of drugs in U.S. cities as a way to challenge the agent's opinion, he chose not to have the agent elucidate this point on cross-examination.

14

the valuation expert on these factors, and how they differed between Bermuda and Miami, in an attempt to make suspect such a large variation between the wholesale prices in these two locations, but did not do so.

*C.      The Motion to Withdraw*

Jurisdiction is always a threshold inquiry of federal courts, and as such, in every instance a federal court must consider whether it has jurisdiction over a matter before addressing the merits of the claim.  See Riley v. Merrill Lynch, Pierce, Fenner, & Smith, Inc., _ _ _ F.3d _ _ _, 2002 WL 1270174, at * 1 (11th Cir. June 7, 2002).

The district court here, pursuant to 28 U.S.C. § 636, referred the case to a U.S. magistrate judge "to take all necessary and proper action as required by law and/or to submit a Report and Recommendation" regarding Rowe's motion to withdraw.  Instead of submitting a Report and Recommendation, the magistrate judge issued an order denying the motion, a copy of which was sent to the district court.  No order entered directly by the district court on this matter appears in this record, nor is there any indication from the record that Brown or her counsel ever raised the issue before the district court for review of the magistrate judge's order.

This court has held that "[a]ppeals from the magistrate's ruling must be to

15

the district court." United States v. Renfro, 620 F.2d 497, 500 (5th Cir. 1980).[9]

Although Brown argues for an equitable exception, the rule is jurisdictional,

see id., and therefore is not subject to equitable exceptions. See McCoy v. United

States, 266 F.3d 1245, 1249 (11th Cir. 2001) ("A jurisdictional defect is one that

"strips the court of its power to act... ." (internal quotation omitted)).[10] We

therefore are without power to review the denial of Rowe's withdrawal motion.


### III.  Conclusion

Based on the foregoing, we AFFIRM Brown's convictions.

AFFIRMED.


HILL, Circuit Judge, concurring *dubitante*:

---

[9]See supra note 5.

[10]At oral argument, Brown's counsel represented that Brown never received a copy of the magistrate judge's order denying Rowe's motion to withdraw, and as such, her time in which to object to the district court was never triggered. It is 28 U.S.C. § 636(b)(1)(C), however, that allows for objections "[w]ithin ten days after being served with a copy," and this provision applies only to proposed findings and recommendations by the magistrate to the district court. Where, as here, the magistrate determines a pretrial matter under 28 U.S.C. § 636(b)(1)(A), there is no requirement that the party receive a copy of the motion before challenging the magistrate's decision to the district court. Nor, on the other hand, is there a time limit prescribed in § 636(b)(1)(A). Presumably, Brown or her attorney had the entire trial during which to ask the district court for reconsideration, and thus endow this court with jurisdiction to review the ruling on Rowe's motion to withdraw. Because it is undisputed that Brown and her counsel received notice of the magistrate's determination, no question of due process arises regarding the alleged failure to receive a written copy of the magistrate's order.

The panel opinion connects the dots leading to an affirmance in a case that leaves me dissatisfied.

First, the defendant asked the court to allow her to discharge her retained counsel, and the retained counsel, citing differences with his client, moved that he be allowed to withdraw. The district judge referred the matter to a magistrate judge who recommended against withdrawal by the attorney. Left, then, with this attorney, the defendant's objections to the magistrate judge's report and recommendation were not put before the district judge. Our precedent says that this insulates the recommendation from our review. That seems disappointing because the record indicates that the magistrate judge declined to allow the defendant to choose her own lawyer, apparently perceiving the situation to be one in which the lawyer was appointed and not retained.

Then, the only real issue was whether or not the defendant, Brown, was aware that the baggage she was carrying had the contraband hidden in it.

The one piece of evidence seized upon by the prosecutor to prove defendant's knowledge was a DEA official's testimony that the contraband was worth $217,000 in Bermuda.[1] On cross-examination, however, this witness agreed

---

[1] The transcript of the eight-page closing argument by the government shows that government counsel referred to evidence of value ten times – "over two hundred thousand dollars" was mentioned five times, and "a quarter of a million dollars" was mentioned five times – as circumstantial evidence that the shipper would not have entrusted such valuable

17

that he had no personal knowledge of the value of the contraband in Bermuda. He brought that figure to the jury because he had called a DEA official in New York who had called a law enforcement officer in Bermuda and passed on what he had learned to the witness. Whether or not this double hearsay was insulated from being stricken as it came from an expert was not presented to the district judge because the attorney the defendant had sought to discharge failed to move to strike it.

Somehow it is less than satisfying to me that a defendant can be confined to the penitentiary for sixty-three months under these circumstances, but I believe that when the dots are connected, it produces that result.

---

merchandise to one who was not aware of it. In a five-page rebuttal argument, the prosecutor referred to both "$200,000" and "a quarter of a million dollars" as proof of defendant's knowledge.