Marcela **CORDOVA**, George Flores, Henry Iurman, Marcos Mustieles, and Katia Ocampo, individually and on behalf of all others similarly situated, Plaintiffs,

v.

**LEHMAN BROTHERS, INC.,** Merrill Lynch & Co., Inc., Raymond James Financial Services, Inc., Oliva Investment Group, Inc., Sun Trust Banks, Inc., and HSBC Bank, U.S.A., Defendants.

No. 05–21169–CIV.

United States District Court, S.D. Florida.

Jan. 17, 2006.

---

Jonathan Cohen, Dario A. Perez, Sandra M. Upegui, Shutts & Bowen LLP, Miami, FL, Victor M. Diaz, Jr., Podhurst Orseck, P.A., Miami, FL, Harley S. Tropin, David P. Milian, Thomas A. Tucker Ronzetti, Christopher F. Branch, Kosyak Tropin & Throckmorton, P.A., Coral Gables, FL, Carlos Velasquez, Plantation, FL, for Plaintiffs.

Christian R. Bartholomew, Bobby Brochin, Morgan Lewis & Bockius LLP, Miami, FL, Dean Bunch, Sutherland Asill & Brennan LLP, Tallahassee, FL, Rudolph Aragon, White & Case LLP, Miami, FL, Richard Critchlow, Harry Schafer, Kenny Nachwalter, P.A., Miami, FL, Patricia Gorham, Sutherland Asbill & Brennan LLP, Atlanta, GA, Theresa L. Davis, Jonathan S. Feld, David H. Kistenbroker, Katten Muchin Rosenman LLP, Chicago, IL, Thomas E. Scott, Cole Scott & Kissane, P.A., Miami, FL, Guy A. Lewis, Michael R. Tein, Lewis & Tein LLP, Coconut Grove, FL, Thomas G. Schultz, Ferrell Schultz Carter & Fertel, P.A., Miami, FL, for Defendants.

## *ORDER*

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant Merrill Lynch's Motion to Dismiss (DE # 62), Defendant Raymond James's Motion to Dismiss (DE # 64), Defendant Lehman Brother's Motion to Dismiss (DE # 65); Defendant HSBC Bank, U.S.A.'s Motion to Dismiss (DE # 66), and Defendant SunTrust's Motion to Dismiss (DE # 82).

UPON CONSIDERATION of the motions and being otherwise fully advised in the premises, the Court enters the following Order:

## *BACKGROUND*

On March 28, 2005, the Securities and Exchange Commission commenced a civil action in this Court against Pension Fund of America, L.C., PFA Assurance Group, Ltd., PFA International Ltd., Claren TPA, LLC, Robert A. De La Riva and Luis M. Cornide (DE # 1 in Case No. 05–20863–CIV–MOORE). On March 28, 2005 and April 15, 2005 respectively, this Court entered a Temporary Restraining Order (DE # 15 in Case No. 05–20863–CIV–MOORE) and an Order of Preliminary Injunction (DE# 58 in Case No. 05–20863–CIV–MOORE) freezing Defendants' assets.

This Court also entered an Order Appointing Receiver and an Amended Order Appointing Receiver (DE#'s 16, 57 in Case No. 05–20863–CIV–MOORE).

On April 28, 2005 Plaintiffs filed this action (DE # 1 in Case No. 05–21169–CIV–MOORE). Plaintiffs amended their complaint on June 22, 2005 (DE # 38). The Plaintiffs in this case are Marcela Cordova, Jorge Flores, Henry Iurman, Marcos Mustieles and Katia Ocampo, individually and on behalf of all others similarly situated (collectively "Plaintiffs"). Am. Compl. at ¶ 4–7. The Defendants are Lehman Brothers, Inc. ("Lehman Brothers"); Merrill Lynch & Co., Inc. ("Merrill Lynch"); Raymond James Financial Services, Inc. ("Raymond James"); Oliva Investment Group, Inc. ("OIG"); SunTrust Banks, Inc. ("SunTrust") and HSBC Bank, U.S.A. ("HSBC") (collectively "Defendants"). *Id.* at ¶ 8–13. Plaintiffs bring this action against Defendants for breach of fiduciary duty and knowing participation in and substantial assistance to the fraudulent scheme perpetrated by Pension Fund of America, its affiliated entities and principles ("PFA") which defrauded investors out of at least $127 million. *Id.* ¶ 1. Plaintiffs allege that PFA and its affiliated entities are unregistered investment advisors that operated in Coral Gables, Florida. *Id.* at ¶ 18.

Plaintiffs allege that PFA sold retirement trusts to investors throughout the world, principally in Latin America. *Id.* at ¶ 17. PFA marketed itself by touting the safety of investing through them with the Defendant financial institutions as trustees. *Id.* at ¶ 18. PFA offered two retirement trust plans: the Liberty Trust, a monthly or annual contribution plan and the Capital Trust, a one-time contribution plan. *Id.* at ¶ 19. Approximately 85% of all inventors chose the Liberty Trust. *Id.* The Liberty Trust required annual contributions of between $1,000 and $20,000 for

ten to fifteen years and imposed significant early withdrawal penalties. *Id.* The Capital Trust was a ten-year plan that required a minimum one-time contribution of $10,000. *Id.* The investment component of both plans provided investors with a choice of eight mutual funds offered by well-known U.S. mutual fund companies. PFA combined the mutual funds with a term life insurance component, provided through PFA Assurance, which purported to give investors a secure return on their investments. *Id.*

PFA affiliated itself with Defendants and touted its relationship with these well-known financial institutions, whose post-investment participation was intended to ensure the safe handling of the investors' funds. *Id.* at ¶ 20. Plaintiffs allege that the principle attraction of PFA's retirement trusts was the promise that major U.S. financial institutions would be the custodians and/or trustees of the investors' funds. *Id.* Plaintiffs allege that they entered into contractual agreements with Defendants for atypical custodial and trustee services. *Id.* at ¶ 21. Plaintiffs allege that with Defendants' knowledge, PFA tricked Plaintiffs into retaining their investments with PFA. *Id.* at ¶ 22.

Plaintiffs contend that the money invested through PFA was diverted and dissipated through a massive fraud perpetrated by PFA with the knowledge and substantial assistance of Defendants. Post-investment PFA improperly pooled investor funds, and thereby failed to segregate each individual retirement trust established by Plaintiffs. *Id.* at ¶ 25. Post-investment, PFA improperly diverted millions of dollars of investor funds to non-investment purposes and failed to disclose to investors that it was siphoning as much as 90% of investor funds for non-investment purposes. *Id.* at ¶ 26. Plaintiffs allege that post-investment PFA charged excessive

front-load fees on the mutual fund component of the retirement trusts and failed to disclose to investors the amount of fees charged. *Id.* at ¶ 27. Post-investment Defendants selected certain mutual funds with excessive front-load fees and redirected investor funds held in trust into the mutual funds selected by Defendants. *Id.* PFA charged some investors average fees and costs of 80% on first-year contributions, placing only a small fraction of investor funds, post-investment, in designated mutual funds. *Id.* In other cases PFA did not place any of the investors' contributions into their designated mutual funds and used all of the investors' funds to pay commissions and other fees and costs. *Id.*

Plaintiffs further allege that post-investment PFA sent investors fraudulent account statements which misrepresented the status and balance of the investors' retirement trust. *Id.* at ¶ 28. The statements failed to disclose the actual amount placed by PFA, post-investment, in the mutual funds designated by investors. *Id.* By not disclosing the deducted commissions, fees and costs, in the statements, the post-investment annual statements vastly overstated the actual amount of investor holdings. *Id.*

Plaintiffs allege that SunTrust played the following role in the PFA fraud: SunTrust, which provided services to PFA from 1999 until 2001, was the first financial institution to offer secure post-investment handling of investor funds. *Id.* at ¶ 31. Plaintiffs allege that SunTrust rendered substantial assistance to PFA's fraud by knowingly allowing its corporate name, corporate logos, and reputation to be used by PFA to assure investors of the safety of their investment. *Id.* at ¶ 32. Plaintiffs allege that SunTrust further rendered substantial assistance to PFA's fraud by directly issuing certificates and statements under the SunTrust logo and seal, and signed by a SunTrust bank officer, which contained false and/or misleading account balances. *Id.* at ¶ 33. Plaintiffs allege that SunTrust further rendered substantial assistance to PFA's fraud by becoming aware and failing to alert investors of false representations being made to investors regarding the safety and security of their retirement trusts established at SunTrust through PFA. *Id.* at ¶ 34. Plaintiffs allege that SunTrust further rendered substantial assistance to PFA's fraud by falsely fielding, responding to and assuaging investor concerns regarding SunTrust's role in securing the safety of their retirement trusts and the security of their investment. *Id.* at ¶ 35.

Plaintiffs allege that Merrill Lynch, Raymond James, OIG and Lehman Brothers played the following role in the PFA fraud: following SunTrust's termination of its relationship with PFA, Merrill Lynch, Raymond James and OIG as Raymond James's exclusive agent in Miami, and Lehman Brothers agreed to serve as post-investment trustees and/or custodians of the funds placed through PFA. *Id.* at ¶¶ 36, 40, 44. Like SunTrust, the other Defendants, Merrill Lynch, Raymond James, OIG and Lehman Brothers agreed to ensure the safe handling of investor funds, post-investment. *Id.* at ¶¶ 37, 41, 45. In addition to providing PFA certain banking services, Merrill Lynch, Raymond James, OIG and Lehman Brothers rendered substantial assistance to PFA's fraud by knowingly allowing their corporate names, corporate logos and their corporate reputations to be used by PFA to assure investors of the safety of their investments. *Id.* at ¶¶ 38, 42, 46. Plaintiffs further allege that Merrill Lynch, Raymond James, OIG and Lehman Brothers rendered substantial assistance to PFA's fraud by falsely fielding, responding to and assuaging investor concerns regarding Merrill Lynch, Raymond James, OIG and Lehman Brothers' roles in securing the

safety of their retirement trusts and the security of their investment. *Id.* at ¶¶ 39, 43, 47.

Plaintiffs allege that HSBC played the following role in the PFA fraud: In 2003 HSBC solicited PFA to serve as the principal post-investment trustee of investor funds placed through PFA. *Id.* at ¶ 48. Plaintiffs allege that HSBC rendered substantial assistance to PFA's fraud by falsely fielding, responding to and assuaging investor concerns regarding HSBC's role in securing the safety of their retirement trusts and the security of their investments. *Id.* at ¶ 50. Plaintiffs allege that HSBC rendered further substantial assistance to PFA's fraud by authorizing duplicative and conflicting "Guide to Plan Provisions" documents provided to investors post-investment, which misrepresented the duties of HSBC, misled investors regarding the fees and costs being charged by PFA and HSBC and even purporting to release PFA from liability for the misappropriation of investor funds. *Id.* at ¶ 51.

Plaintiffs allege that HSBC rendered substantial assistance to PFA's fraud by re-directing the investment component of PFA's "retirement trusts" into mutual funds of HSBC's choosing and by writing a letter to various mutual fund companies in 2004 directing those companies to re-calculate their front-load fees so as to charge the maximum fees to investors. *Id.* at ¶ 52.

Plaintiffs allege that HSBC rendered further substantial assistance to PFA's fraud by authorizing HSBC personnel to travel through Latin America to meet with PFA's sales force and investors, to falsely reassure them of the safe handling of their funds, the security of their investment, the integrity of PFA's operations and HSBC's role in overseeing the safety of investor retirement trusts. *Id.* at ¶ 53. Additionally, HSBC authored and allowed PFA to send a letter in the fall of 2004, falsely assuaging investor concerns regarding the accuracy of account statement information, misrepresenting HSBC's role in preparing the account statement information and falsely vouching for the integrity of the retirement trust balances disclosed to investors. *Id.* at ¶ 54. HSBC became aware of the false representations being made to investors regarding the safety and security of their retirement trusts. *Id.* at ¶ 55. HSBC assisted PFA in circumventing foreign currency, banking and insurance regulations governing PFA's activities in Latin America. *Id.* at ¶ 56. HSBC sent a letter dated October 27, 2003 on HSBC letterhead and signed by Joseph Brennan, Vice President of HSBC ("Brennan"), informing investors that "Pension Fund of America has signed a Master Trust Agreement with HSBC Bank" and that pursuant to that Agreement, "HSBC Bank will serve as Trustee under directions from PFA with regard to the Investment Components of PFA's agreement with you." Brennan's letter did not fully disclose all the material facts about PFA then known to HSBC, giving Plaintiffs a false sense of security about their investments and thereby inducing them to retain their investments at PFA. *Id.* at ¶ 57.

Plaintiffs bring a three Count complaint against Defendants. Count I alleges a claim for aiding and abetting common law fraud. Count II alleges a claim for aiding and abetting breach of fiduciary duty. Count II alleges a claim for breach of fiduciary duty.

### DISCUSSION

Defendants contend that Plaintiffs' Amended Complaint is due to be dismissed because the Securities Litigation Uniform Standards Act ("SLUSA") preempts Plaintiffs' claims.

In 1995 Congress enacted the Private Securities Litigation Reform Act (PSLRA), which established uniform stan-

dards for class actions alleging securities fraud. The procedural reforms enacted by the PSLRA were intended to prevent plaintiffs from bringing "strike suits" in securities matters. H.R. Conf. Rep. No. 105–803, at 13 (1998) (discussing the PSLRA). A strike suit is defined as "[a] suit ... often based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement." Black's Law Dictionary (Bryan A. Garner ed., 7th ed.1999).

Congress found that the high costs of defending strike suits often forced defendants to settle meritless class actions. H.R. Conf. Rep. No. 104–369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730. The PSLRA addressed this problem by instituting heightened pleading requirements for class actions alleging fraud in the sale or purchase of national securities. *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1340 (11th Cir.2002). The PSLRA also required a mandatory stay of discovery until the district court could determine the legal sufficiency of the class action claims. *See* 15 U.S.C. § 78u–4(b)(3)(B).[1]

By 1998, however, it became apparent to Congress that the objectives of the PSLRA were being frustrated, because plaintiffs were evading the PSLRA's heightened pleading requirements by bringing suit in state court rather than federal court. Securities Litigation Uniform Standards Act of 1998, Pub.L. No. 105–353, § 2(2)-(3), 112 Stat. 3227, 3227; *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101, 108 (2d Cir.2001) (noting that "litigants were able to assert many of the same causes of action, but avoid the heightened procedural requirements instituted in federal court"). Congress thus resolved that:

> [I]n order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits.

Pub.L. No. 105–353, § 2(5).

As a result, Congress passed the Securities Litigation Uniform Standards Act

---

1. Section 78u–4 provides in relevant part:
    (1) Misleading statements and omissions
    In any private action arising under this chapter in which the plaintiff alleges that the defendant—
    (A) made an untrue statement of a material fact; or
    (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
    ...

    (3) Motion to dismiss; stay of discovery
    (A) Dismissal for failure to meet pleading requirements
    In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.
    (B) Stay of discovery
    In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.
    15 U.S.C. § 78u–4(b)(1), (3).

("SLUSA"), which amended the Securities Act of 1933 and the Securities Exchange Act of 1934 and made federal court, with limited exceptions, the sole venue for class actions alleging fraud in the purchase and sale of covered securities. *Riley,* 292 F.3d at 1341. Congress further mandated that such class actions would be governed by federal law rather than state law. *See* H.R. Conf. Rep. No. 105–803, at 13. To that end, SLUSA preempts covered class actions based on the statutory or common law of any state alleging a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security. *Riley,* 292 F.3d at 1341.[2]

█ Plaintiffs' claims in this case are state law claims that were brought in federal court pursuant to diversity jurisdiction. Defendants argue that SLUSA preempts Plaintiffs' claims and requires dismissal of this action. To warrant dismissal under SLUSA a defendant must show that (1) the suit is a "covered class action;" (2) the plaintiffs' claims are based on state law; (3) one or more "covered securities" has been purchased or sold; and (4) the defendant misrepresented or omitted a material fact "in connection with the purchase or sale of such security." *See id.* at 1342.

### 1. *Covered Class Action*

SLUSA defines a "covered class action"
(i) any single lawsuit in which—

　(I) damages are sought on behalf of more than 50 persons or prospective class members, and questions

of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

　(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or purpose.

15 U.S.C. § 78bb(f)(5)(B)(i)(I), (II).

Plaintiffs have brought this suit on behalf of themselves and other unnamed parties similarly situated. Am. Compl. at ¶¶ 60–65, 79, 87 and 92. In fact, Plaintiffs allege that the Class includes approximately 3,400 investors. *Id.* at ¶ 61. Plaintiffs allege that common questions of law or fact predominate over any questions affecting only individual persons. *Id.* at ¶¶ 67–70. Plaintiffs' allegations, therefore, support the conclusion that the instant lawsuit is a covered class action. In fact, Plaintiffs admit that this is a covered class action. *See, e.g.,* Pl. Am. Opp. to Merrill Lynch Mot. at 9, n. 17.

---

**2.** The SLUSA amended the 1933 Act to provide as follows:

　(b) Class action limitations
　No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging-

(1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.
15 U.S.C. § 77p(b)-(c). An identical amendment was made to the 1934 Act. *See id.* § 78bb(f)(1)-(2).

### 2. *Claims Based on State Law*

Plaintiffs bring a three count complaint against Defendants, raising only Florida state law claims. Count I alleges a claim for aiding and abetting common law fraud. Count II alleges a claim for aiding and abetting breach of fiduciary duty. Count III alleges a claim for common law breach of fiduciary duty. Indeed, Plaintiffs admit that the amended complaint asserts state law claims. *See, e.g.,* Pl. Am. Opp. to Merrill Lynch Mot. at 9, n. 17. Thus, based on Plaintiffs' allegations this is clearly a class action based upon the statutory or common law of a state.

### 3. *Covered Securities*

■ SLUSA defines a "covered security" as "a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 78bb(f)(5)(E), 15 U.S.C. § 77r(b)(2). In this instance, Plaintiffs' product, "retirement trusts," consisted of a term-life insurance policy component and a mutual fund investment component and an annuity component. *See, e.g.,* Pl. Am. Opp. to Merrill Lynch Mot. at 10. The mutual fund investment component of both the Liberty Trust and Capital Trust was comprised of a "choice of eight mutual funds offered by well-known U.S. mutual fund companies, such as Fidelity, Legg Mason, Janus and Goldman Sachs." Am. Compl. at ¶ 19.

Plaintiffs argue that the retirement trusts do not fall within SLUSA's definition of a covered security. Plaintiffs base this assertion on three facts: first, the retirement trusts were not listed or authorized for listing on a national exchange; second, none of the commingled investor funds were ever segregated into separate accounts for registration under of 1940 Act; and third, PFA was not registered, nor did it file for registration under the Investment Company Act of 1940. Plaintiffs additionally argue that the fact that one component of the retirement trust was an investment in mutual funds does not make the trust a covered security. *See, e.g.,* Pl. Am. Opp. to Merrill Lynch's Mot. to Dismiss at 10, n. 20; Pl. Am. Opp. to HSBC's Mot. to Dismiss at 12, n. 24 (citing *Behlen v. Merrill Lynch,* 311 F.3d 1087 (11th Cir.2002) and arguing that the retirement trusts in this case are unlike the mutual funds at issue in *Behlen* ). The Court finds each of Plaintiffs' arguments unpersuasive.

With respect to Plaintiffs' argument that the fact that one component of the retirement trust was an investment in mutual funds does not make the trust a covered security, the Eleventh Circuit's discussion in *Herndon v. Equitable Variable Life Ins. Co.,* 325 F.3d 1252 (11th Cir.2003) is instructive. In addressing whether a variable life insurance policy is a "covered security" under SLUSA, the *Herndon* court engaged in the following analysis: A variable life insurance policy allows an investor to allocate a portion of his premium dollars to a separate account comprised of various instruments and investment funds within the insurance company's portfolio. The *Herndon* court reasoned that because variable annuities, without the life insurance component, are covered securities, the variable life insurance policy is also a covered security. The Court held that the fact that a variable life insurance policy account adds a life insurance component to the investment does not negate the fact that the statutory requirements of SLUSA have been met with regard to the annuity component of the insurance policy. *Id.* at 1255.

The case before this Court is easily analogous. PFA sold Plaintiffs a "trust" that was comprised of a mutual fund investment and a life insurance policy. Mutual funds, "[t]he most common form of invest-

ment company," are regulated under the Investment Company Act of 1940 and are covered securities. *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 698, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). The fact that Plaintiffs coupled the option to invest in mutual funds with a term life insurance plan does not negate the fact that the statutory requirements of SLUSA have been met with regard to the mutual fund component of the retirement trust. As such, the retirement trust is a "covered security" under SLUSA. The fact that the variable life insurance policies were not listed or authorized for listing on a national exchange on a national exchange did not impact the court's analysis in *Herndon* and does not impact this Court's analysis with respect to Plaintiffs' retirement trusts.

Plaintiffs argue that the fact that the commingled investor money was never segregated into separate accounts precludes a finding that the "trusts" were covered securities. This argument is misleading. In making this argument Plaintiffs are attempting to distinguish *Patenaude v. Equitable Life Assurance Soc'y*, 290 F.3d 1020 (9th Cir.2002), wherein the court reasoned that the tax-deferred annual annuities at issue were covered securities under SLUSA. The *Patenaude* court noted that when variable annuities are sold by insurance companies, they must be offered through separate accounts, as described by the Investment Company Act of 1940. The separate accounts must be registered with the SEC as investment companies, even though the variable annuity products are sold by insurance companies. The court found that the variable annuity that the plaintiff purchased contained a separate account created by Equitable Life that permitted the annuity holder to invest in mutual funds and like securities. This separate account was registered with the SEC as an investment company under the Investment Company Act of 1940. Thus,

the Court found that by the plain language of the statute, the deferred tax variable annuity purchased by *Patenaude* qualified as a "covered security" within the meaning of SLUSA. The *Patenaude* court did not find that the tax-deferred annuities were covered securities *because* a separate account was created by Equitable Life that permitted the annuity holder to invest in mutual funds and like securities. Rather, it was the fact that the separate account was *registered* as an investment company under the Investment Company Act of 1940, that brought the tax-deferred annuities within the plain language definition of a covered security under SLUSA. Moreover, *Patenaude* concerned variable annuities and not mutual funds which are covered securities independent of whether they are segregated into separate accounts and registered. In this instance, the fact that PFA commingled investor funds and did not create separate sub-accounts, does not preclude a finding that the retirement trusts are covered securities, but rather, is presumably another way in which PFA engaged in misconduct.

Plaintiffs' last argument that PFA was not registered, nor did it file for registration under the Investment Company Act of 1940, is equally unavailing. *See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir.2001) (rejecting the claim that SLUSA did not apply because the company selling the investment was not registered under the Investment Company Act of 1940, where the investment itself met the test for a covered security). This is simply another way in which PFA apparently engaged in misconduct. Accordingly, based on the foregoing, the Court concludes that the retirement trusts are covered securities under SLUSA.

4. *In Connection with the Purchase or Sale of Covered Securities*

    ██ SLUSA does not define the phrase "in connection with the purchase or sale of

a covered security." The Supreme Court has not had occasion to interpret this phrase in the context of the SLUSA,[3] but has interpreted the identical phrase as it appears in Rule 10b–5, which implements section 10(b) of the 1934 Act.[4] *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737–38, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip,* the Supreme Court held that there is no cause of action under Section 10b–5 unless a challenged misrepresentation or omission caused the plaintiff to buy or sell a particular stock. 421 U.S. at 748–49, 95 S.Ct. 1917. In *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc. et al.,* the Eleventh Circuit looked to *Blue Chip* in determining that Congress intended the phrase "in connection with" to have the same meaning under the SLUSA that it has under Section 10b–5, because the SLUSA was enacted as an amendment to the 1933 and 1934 Acts. 292 F.3d 1334, 1342–43 (11th Cir.2002). Recently, in *Securities Exchange Commission v. Zandford,* the Supreme Court again addressed the "in connection" element in an action under § 10(b) and Rule 10b–5. 535 U.S. 813, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). The Court unanimously accepted the SEC's "broad reading of the phrase 'in connection with the purchase or sale of any security,'" and held that the requisite connection is established where a "'fraudulent scheme' and a 'securities transaction' coincide." *Id.* at 819, 825, 122 S.Ct. 1899.

Plaintiffs in this case argue that their claim is not one "in connection with the purchase an sale of securities" because they have brought a claim solely based on the post-investment retention of their retirement trusts. Defendants argue that Plaintiffs' claims concern not only the retention of covered securities but, as alleged, concern the purchase and sale of securities.

With respect to "holder" or "retention" claims, the Eleventh Circuit in *Riley,* stated that:

> SLUSA does not apply to claims dealing solely with the retention of securities, rather than with purchase or sale. We also agree ... however, that when a claim that sweeps within its ambit actual purchases or sales of stock is covered by SLUSA, a plaintiff may not avoid SLUSA's restrictions simply by alleging that a given misrepresentation caused him both to purchase and hold a particular security.

292 F.3d at 1345.

Thus, the central issue before this Court is whether Plaintiffs' state law complaint deals solely with the retention of securities or whether Plaintiffs' state law complaint alleges a material misrepresentation or omission in connection with the purchase or sale of a covered security in addition to alleging claims based on the retention of securities. If the latter is true, the action

---

**3.** The Supreme Court will hear oral argument in *Dabit v. Merrill Lynch,* 395 F.3d 25 (2d Cir.2005) on January 18, 2006. The Court will decide "whether SLUSA preempts state law class action claims based upon allegedly fraudulent statements or omissions brought solely on behalf of persons who were induced thereby to hold or retain (and not purchase or sell) securities?"

**4.** Section 10(b) makes it "unlawful for any person ... to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b). Rule 10b–5 prohibits the use of "any device, scheme, or artifice to defraud" or any other "act, practice, or course of business" that "operates ... as a fraud or deceit." 17 C.F.R. § 240.10b–5.

must be dismissed as preempted under SLUSA.

In *Behlen v. Merrill Lynch,* the Eleventh Circuit held that despite plaintiffs' removal of "all explicit references to any fraudulent activity" from their state law complaint, breach of contract claims involving misrepresentations by a securities broker were sufficiently connected to a securities transaction to trigger preemption. 311 F.3d 1087, 1090 (11th Cir.2002). Other courts have similarly scrutinized the pleadings to arrive at the "essence" of a state law claim, in order to prevent artful drafting from circumventing SLUSA preemption. *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 395 F.3d 25, 34 (2d Cir.2005); *Dudek v. Prudential Sec., Inc.,* 295 F.3d 875, 880 (8th Cir.2002); *see also Prof'l Mgmt. Assocs., Inc. v. KPMG LLP,* 335 F.3d 800, 803 (8th Cir.2003) (preempting state law claims where the "complaint implicitly alleges" that "misrepresentations and omissions were made in connection with the purchase or sale of securities") (emphasis added); *Falkowski v. Imation Corp.,* 309 F.3d 1123, 1131 (9th Cir.2002) (preempting state law claims involving employee stock options because "representations about the value of stock ... are properly subject to uniform federal standards").

Plaintiffs bring three claims against Defendants: aiding and abetting common law fraud, aiding and abetting breach of fiduciary duty and breach of fiduciary duty. The amended complaint for the most part scrupulously avoids referring to any misrepresentations and omission in connection with purchases and sales of the retirement trusts and instead refers continuously to

PFA's post-investment fraudulent scheme and Defendants' role in that scheme. However, Plaintiffs do allege that *"[a]ll claims by Plaintiffs and the unnamed Class members are based on the same alleged across the board conduct by Defendants in fraudulently inducing them to choose PFA to handle their retirement investments and retain their investments at PFA."* Am. Compl. at ¶ 67 (emphasis added).[5] Plaintiffs have thus clearly alleged that Defendants' conduct caused Plaintiffs to purchase the covered securities as well as retain them. Plaintiffs' own allegations confirm that the claims as set forth in the Amended Complaint are closely intertwined with the purchase of the retirement trusts.

Moreover, the nature of various of Plaintiffs' other allegations is telling. Plaintiffs allege that Defendants knowingly permitted their names, logos and reputations to be used to deceptively "assure investors of the safety of their investment." Am. Compl. at ¶¶ 32, 33, 38, 42, 46, 49. Plaintiffs, however, do not distinguish whether this assurance of safety occurred only post-investment or consistent with their other allegations, to induce investment. Logic dictates, that in order to effectuate its scheme to defraud investors, an integral component of PFA's plan would be the assurance of safety to induce the purchase. Moreover, Plaintiffs' complaint is replete with allegations that connect Defendants' alleged malfeasance to the purchase and sale of securities. These allegations make it clear that Plaintiffs were fraudulently *induced to purchase* the trusts/securities based on allegedly false assurances that their funds would be pro-

---

**5.** "[P]reemption does not turn on whether allegations are characterized as facts or as essential legal elements of a claim, but rather on whether the SLUSA prerequisites are 'alleged' in one form or another." *Rowinski v. Salomon Smith Barney Inc.,* 398 F.3d 294, 300 (3d Cir.2005). In fact, Plaintiffs in this case "reallege and incorporate by reference paragraphs 1–71 of this Complaint," into each of the three counts. *See* Am. Compl. ¶¶ 72, 80, 88.

tected by Defendants. According to the amended complaint, beginning in 1999 and continuing through March 28, 2005 PFA engaged in a fraudulent business scheme and sold "what it claimed were retirement trusts to investors throughout the world." *Id.* at ¶ 17. "PFA combined the mutual funds with term life insurance component ... which *purported to give investors a secure return* on their investments." *Id.* at ¶ 19. "PFA *successfully marketed itself by touting the safety* of investing through them with the Defendant financial institutions as trustees." *Id.* at ¶ 18. "PFA affiliated itself with Defendants and *touted its relationship* with these well-known financial institutions, whose post-investment participation was intended to ensure the 'safe handling' of the investors' funds." *Id.* at ¶ 20. "The *principal attraction of PFA's retirement trusts was the promise* that major U.S. financial institutions ... would be the custodians and/or trustees of the investor funds." *Id.* at ¶ 20. "As a *marketing tool,* PFA promised Plaintiffs ... 'total safety because the money deposits are receiver directly by [Defendant] HSBC Bank, U.S.A.' " *Id.* at ¶ 23.

Furthermore, considering that *"[a]ll claims by Plaintiffs and the unnamed Class members are based on the same alleged across the board conduct by Defendants in fraudulently inducing them to choose PFA to handle their retirement investments and retain their investments at PFA,"* Am. Compl. at ¶ 67, Plaintiffs' putative class definition, fails to distinguish between those who purchased and held the retirement trusts in reliance on those misrepresentations or omissions and those who only held the retirement trusts based on those misrepresentations or omissions.

Plaintiffs purport to bring this action on behalf of "[a]ll persons who held and/or retained investments in retirement trust plans offered by PFA, or its affiliated companies, during the period commencing Jan-

uary 1999 through the present ('Class Period')." Am. Compl. at ¶ 60. The only entities identified by Plaintiffs as having been excluded from the proposed class are "Defendants, PFA, PFA Assurance, PFA International, Claren TPA, Luis Cornide, Robert de la Riva and all the Defendants' alter-ego entities, all employees or agents of Defendants and agents of Defendants' alter ego entities, all subsidiaries and affiliates of the Defendants, the Defendants' officers, agents, and employees, any agents or brokers (and their immediate family members) who sold or solicited the sale of investments in PFA or PFA Assurance." *Id.*

The proposed class is not limited to non-purchasers and therefore, necessarily encompasses claims by investors who purchased PFA's retirement trusts during the class period and thereby became members of the putative class. *Dabit,* 395 F.3d at 45. Although Plaintiffs disavow claims based on purchases or sales, given the duration of the class period, from 1999, the inception of PFA's fraud, until the present, the putative class necessarily encompasses purchasers of securities and not just those who held or retained their retirement trusts. If as alleged, Defendants' actions steered purchasers into buying the retirement trusts, then those class members' claims for damages from post-investment retention of the trusts are inextricably related to their purchases of the retirement trust and are preempted by SLUSA. *See Dabit,* 395 F.3d at 45–46 ("[I]t is sensible to require a would-be 'holding' lead plaintiff expressly to exclude from the class claimants who purchased in connection with the fraud and who therefore could meet the standing requirement of a 10b–5 action.").

Because the complaint does not include sufficient information to permit the court to identify and separate preempted and

non-preempted subclasses, Plaintiffs' state law claims must be dismissed. *See Dabit,* 395 F.3d at 46; *Atencio v. Smith Barney,* 2005 WL 267556, at *5, 2005 U.S. Dist. LEXIS 1526, at *18 (S.D.N.Y. February 2, 2005) (finding that state law claims of class defined as "all persons and entities who held shares" of funds during class period and specifically excluded claims based on the purchase or sale of shares of funds during class period nonetheless were preempted by SLUSA). In this case, the putative class is not even as restricted as the purported class in *Atencio* which specifically excluded claims based upon the purchase or sale of shares of the funds. The putative class in this case plainly includes persons who purchased during the class period and then held the trusts. Thus, under *Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1340 (11th Cir.2002) these claims must be dismissed under SLUSA.[6]

The Court further notes that Plaintiffs have alleged that an integral part of De-

fendants' alleged aiding and abetting common law fraud and aiding and abetting breach of fiduciary duty and breach of fiduciary duty, was Defendants' knowledge that PFA charged excessive front-load fees on the mutual fund component of the retirement trusts. Am. Compl. at ¶¶ 74, 84, 91. In assessing whether the defendants' misrepresentations and omissions were "in connection" with the purchase or sale of securities, the Eleventh Circuit in *Behlen v. Merrill Lynch,* noted that the very reason that the plaintiffs were sold the mutual funds at issue was because those funds were subject to the excess fees and commissions. 311 F.3d 1087, 1094 (11th Cir. 2002). Thus, the court held, the fees and commissions were not incidental to the sale of the securities, but were an integral part of the transactions. *Id.* In the instant case, to the extent that Plaintiffs' claims regarding Defendants' misrepresentations and omissions concern Defendants' constructive knowledge of excess fees and commissions, those misrepresentations and

---

**6.** Certain Defendants argue that because the Capital Trust, chosen by 85% of the investors, required monthly or annual contributions for ten to fifteen years, the holders of these trusts would be making purchases of covered securities each year or month and thus the class necessarily includes purchasers. *See, e.g.,* Lehman's Reply at 5; HSBC's Mot. to Dismiss at 5 (citing *Goodman v. Epstein,* 582 F.2d 388, 414 (7th Cir.1978)).

Defendants' argument, however, is inapplicable in the instant case, where as alleged by Plaintiffs, investors were "required" to make their monthly or annual contributions. Am. Compl. at ¶ 19. *See, e.g., Hill v. Equitable Bank,* 655 F.Supp. 631, 638–39 (D.Del.1987), *aff'd,* 851 F.2d 691 (3d Cir.1988) (holding that installment payments did not constitute separate purchases because the plaintiffs were not free to forego making the payments. The plaintiffs had bound themselves to make the payments when they initially entered into the agreement to purchase the partnership shares and were not free subsequently to avoid going forward with the transaction. The payments were not discretionary and by paying the in-

stallments when due, plaintiffs were not engaging in new investments but rather paying an already existing obligation); *Helman v. Murry's Steaks, Inc.,* 742 F.Supp. 860, 869–873 (D.Del.1990) (holding that because the plaintiff obligated herself to sell her shares when she entered into the Definitive Agreement, the two separate closings of the sale did not constitute separate "sales" for purposes of the federal securities laws. The court stated that the key factors were (i) whether the parties were obligated to perform at the time they entered the sale agreement, and (ii) whether the parties had the power to terminate the transaction after they had entered into the Definitive Agreement); *cf. Cooper v. Pac. Life Ins. Co.,* 2005 WL 1866166, 2005 U.S. Dist. LEXIS 16465 (S.D. Ga. August 4, 2005) (finding that where investors were not obligated to make additional investments into their Pacific Life variable annuities, each new investment was voluntary, and independent of previous commitments to buy securities. Thus, any securities fraud that occurred during the later transactions is independently actionable.).

omissions undoubtedly coincided with a securities transaction. *See Zandford*, 535 U.S. at 820, 825, 122 S.Ct. 1899 (finding Rule 10b–5's "in connection with" requirement satisfied when "the securities transactions and breaches [complained of] ... coincided" and "were not independent events."); *Dabit*, 395 F.3d 25 (2d Cir.2005) (holding that "claims for commissions paid ... are preempted"). The commission and fee structure giving rise to the claimed aiding and abetting common law fraud, aiding and abetting breach of fiduciary duty and breach of fiduciary duty only accrued once Plaintiffs purchased securities.

Despite Plaintiffs' best efforts, Plaintiffs have failed to plead a pure holder claim. However, because the Court finds that it is possible for Plaintiffs to allege a set of facts asserting a pure holder claim for aiding and abetting common law fraud, aiding and abetting breach of fiduciary duty and breach of fiduciary duty, as they are in reality post-investment claims, the Court dismisses Plaintiffs' Amended Complaint without prejudice and Plaintiffs are given leave to replead their complaint.[78]

### CONCLUSION

Accordingly, based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant Merrill Lynch's Motion to Dismiss (DE # 62), Defendant Raymond James's Motion to Dismiss (DE # 64), Defendant Lehman Brother's Motion to Dismiss (DE # 65); Defendant HSBC Bank, U.S.A.'s Motion to Dismiss (DE # 66), and Defendant SunTrust's Motion to Dismiss (DE # 82) are GRANTED IN PART. Plaintiffs' Amended Complaint is DISMISSED without prejudice. Plaintiffs may, within ten (10) days of the date of this Order, file a second amended complaint.

---

**7.** The Court is mindful that depending on the Supreme Court's decision in *Dabit*, dismissal of this action may be warranted even if Plaintiffs successfully allege a pure holder claim.

**8.** Because this Court holds that Plaintiffs' Amended Complaint is preempted under SLUSA, there is no need to examine the defendants' many alternative grounds for dismissing the this action.